[Continental Life Insurance Company v. Webb, Adm'r, et al.]

December. The plaintiff, being at a distance, did not receive notice of this transfer till the Sunday following, and on Saturday the bankers failed." Held a good payment.

A similar principle was declared in the case of *Stewart v. Aberdeen*, 4 Mees. & Wels. 211. See, also, *Anderson v. Robinson*, 3 Camp. 199; see, also, opinion of Spencer, Senator, in *Stone v. Hayes*, 3 Denio, on page 584, where he states this same principle. This, though a dissenting opinion, does not appear to have been disputed on this point.

If, when the money on this draft fell due, Luke Matthews had received of Bradley, Wilson & Co., of the moneys in their hands belonging to him, a sum sufficient to meet this draft, and had immediately repaid it to Bradley, Wilson & Co. on the draft, no one will dispute that the payment would have been good. We can perceive no material difference between the supposed case and the one in hand.

We think the complainant has no right of recovery against Luke Matthews—has no equitable demand against Bradley, Wilson & Co.—and the decree of the chancellor dismissing the bill is affirmed.

Chief Justice BRICKELL, having been of counsel, not sitting.

# Continental Life Insurance Company *v.* Webb, Adm'r, *et al.*

*Bill in Equity to determine who were Beneficiaries under Policy of Life Insurance, and to compel Insurer to pay Money into Court.*

1. *Cross bill; when not authorized.*—A cross bill is a mere dependency upon the original suit, and can not be supported upon new and distinct matter, not involved in the original bill.

2. *Same; when must fail.*—When the original bill is without equity, the cross bill must fail.

3. *Policy of life assurance; construed.*—A policy of life assurance, which covenants to pay the sum insured to the wife of the assured, if she survive him, or in event he survive her, to her children, is a contract creating only legal obligations and rights; and upon the happening of the contingency on which it is payable to the children, vests in them a joint legal interest; and, being a contract for the payment of money, the personal representative of a beneficiary succeeds, on his death, to his rights, and must join with the survivors in any action at law for the recovery of the sum assured, which furnishes a complete and adequate remedy for the enforcement of the contract, and the determination of the rights of the parties.

VOL. LIV.

[Continental Life Insurance Company v. Webb, Adm'r, et al.]

3. *Same; when bill filed as to, without equity*—A bill in such a case, by the personal representative of one claimed to be a beneficiary, to ascertain who are the beneficiaries, to determine the quantum of their interests, and to compel the insurer to pay the money into court for distribution accordingly, which assigns no other ground for withdrawing these matters from the determination of the law court, than the fact that two of the surviving beneficiaries have the custody of the policy, and one of them, on demand, refused to exhibit it, wherefore, he can not state its terms and conditions with accuracy, and seeks a discovery of it,—is without equity.

5. *Bill for discovery; what must state.*—In a bill for discovery purely, it may not be necessary to show that the facts sought to be discovered are incapable of proof otherwise; but where discovery and relief are sought, as to matters of purely legal cognizance, it must be shown that the facts sought to be discovered can not otherwise be established, and such discovery is indispensable to the ends of justice.

6. *Policy of life insurance; what law governs as to validity and construction of.* A policy of insurance issued by a New York corporation, providing that it shall not take effect until countersigned by the company's agent here, and actually delivered here, must be governed, as to its validity and construction, by the laws of this State; and where such a policy covenants to pay the sum insured to the wife of the assured, if she survived him, or, in event he survived her, to her children, &c., "in conformity with the statute in such case made and provided," the construction of our statute on that subject must govern in determining what persons come within the designation "children."

7. *Statutes authorizing insurance of husband's life for wife, &c., and policy conforming to statute; construed.*—A policy of assurance on the life of the husband recited that it was issued in consideration of certain representations, and a cash premium paid by the wife, and certain premiums to be paid thereafter, in consideration whereof the company insured the life of the husband, "for the sole use of the wife," in a certain sum; and covenanted to pay, or cause to be paid, the sum insured to the wife, "for her sole use, in conformity with the statute in such case made and provided," . . . . "and in event of the death of the wife before the decease of the husband, the amount of said insurance shall be payable to her children for their use, or to their guardian, if under age," &c. This policy was issued in another State, but did not become effective until delivered here. The wife died before her husband. Some of their children, living at the date of the delivery of the policy, survived both parents, and others died before either parent. There also survived both husband and wife, grand children whose parents died before the delivery of the policy. *Held*, 1. The wife's right was dependent on her surviving the husband, and on her death prior to his, and upon the happening of the contingency on which the policy was payable, her rights, and the covenants to pay the insurance money, vested in the children. 2. The children to whom the covenants in the policy extend, are children living at the death of both father and mother—children to whom the duty of maintenance extends if they were in minority; no other persons are within the words and spirit of the statute, or included in the covenants of a policy which conforms to it. 3. Whether children dying after the mother, and before the father, would take under the covenants, is not decided.

8. *Refusal of leave to amend; when proper.*—It is not error to refuse leave to amend the bill generally, to obviate objections pointed out by demurrer, after the chancellor announces his decision on demurrer ; the particular amendment desired should be presented to the chancellor, that he may determine whether it is allowable.

APPEAL from Chancery Court of Hale.

Heard before Hon. CHARLES TURNER.

The original bill, in this cause, was filed on the 19th of September, 1874, by James E. Webb, as administrator of Lucy T. Sheppard, deceased, against Waller, as personal

representative of Catherine Drake and William B. Drake; Garrett, as administrator *de bonis non* of Alpheus Drake, deceased; Ida B. Casey, a minor; Mirian French and her husband, W. H. Drake, Wm. R. Lanier, a minor; and the Continental Life Insurance Company, of New York.

The case made by the bill was thus: In 1868, the Continental Life Insurance Company, of New York, executed and delivered, through its agent in Mobile, to W. B. Drake, a policy of assurance upon his life. Catherine G. was the wife of William B., and was living when the policy of assurance was delivered, but died before her husband. At the date of the delivery of the policy, said William B. and Catherine had the following living children: Alpheus B. Drake, who died before either his father or mother; Lucy T. Sheppard, complainant's intestate, who also died before either of her parents; Mirian L. French and Wm. H. Drake, who are still living; and two grand children still living, the minors above named, children of Sarah and Amanda, two of Catherine's children, who died before the policy was issued. The bill alleges that from the time the policy was delivered up to William B.'s death, in December, 1872, he paid the premiums, and kept it in force; that "after his death, the policy fell or came into the hands of Mirian French, A. P. French, her husband, and Wm. H. Drake, in whose custody it now is; and that your orator has never been permitted to see said policy, though on one occasion he requested said A. P. French to exhibit it to your orator, but he refused. And so it is, your orator, not having access to said policy, can not state with accuracy all its terms and conditions; and that its terms may be seen and known by all, he asks a discovery thereof, and that said Mirian and her husband, and said Wm. H. Drake, be required to produce the original policy in court, and that the Continental Life Insurance Company may discover and make known the terms of their said contract, by producing it, or a copy, if they have one."

The bill, however, charges, on information and belief, that the annual premiums to be paid amounted to $571; that the amount insured was $10,000, during the term of said Wm. B. Drake's natural life, from the 16th day of October, 1868, "and for the sole use of his wife, Catherine G.; that the insurance company agreed and bound themselves to pay the sum insured to Catherine G., within ninety days after due notice and satisfactory evidence of the death of said William B. during the continuance of the policy, and it was further provided, in event of the death of said Catherine before the death of said William B., the amount should be payable to her children, for their use, or their guardian, if

under age; and that said company thereby became bound and liable to pay the amount of said insurance according to the form and terms of their said contract; and that orator, as administrator of Lucy T. Sheppard, became entitled to have and receive from said Continental Life Insurance Company, in right of his intestate, a large sum of money, as her share of said insurance."

Due proof of notice of the death of said Wm. B. Drake is alleged, and the bill then states "that without the discovery sought, it would be impossible for orator to successfully maintain any action for the recovery of his intestate's share of the insurance money." It is further stated that said Mirian claims one-fourth of the assurance money in her own right, and a like amount as transferee of her brother William; that the guardians of the two minors, and the personal representative of Alpheus, also claim an interest in said insurance money.

The bill prays for an account of the amount due upon the policy; that for the amount thus found due, execution be issued against the Continental Life Insurance Company; that a receiver be appointed to have the custody of the fund pending the adjustment of the rights of the various claimants; that the court will determine and decree the amount to be paid to each of the claimants; that an injunction issue to restrain the life insurance company from paying over the amount due on said policy to any other person than the receiver or officer appointed by the court, and for general relief. The bill also contained prayers for the appointment of guardians *ad litem* for the minors, and publication as to non-residents. All the parties having been properly brought before the court, answers were filed, or decrees *pro confesso* taken.

The Continental Life Insurance Company makes a copy of the policy a part of its answer, and admitted a liability to pay the policy to those rightfully entitled to it, less certain claims it held for loans and deferred premiums, which reduced the amount due to $9,060 51, and offered to pay that sum to the persons legally entitled thereto, under the orders of court. The answer further sets up as a defense to this suit that John H. Stone, J. R. Edwards, and J. S. Pringle, creditors of W. B. Drake, filed their bill in the chancery court at Mobile, against defendant and others, to subject the amount due on said policy to payment of their claims against said Wm. B. Drake. This bill was dismissed on demurrer, from which decree an appeal was taken to the supreme court, where it is still pending.

The policy, made an exhibit to this answer, shows that the

Continental Life Insurance Company caused their corporate seal to be thereunto affixed, and these presents to be signed by their president and secretary at New York, this 25th day of November, 1868, and also contained a provision that "the policy shall take effect only when countersigned by the company's agents at Mobile, Alabama."

The policy recites that it is made in consideration of the representations made in the application for the policy, and $126 89 in hand paid by Catherine G. Drake, and a like amount payable in February and June of each year during the continuance of the policy; and in consideration thereof, the company assures "the life of William B. Drake, of Hale county, State of Alabama, for the sole use of his wife, Catherine G. Drake, and children, in the amount of ten thousand dollars, for the term of his natural life. And the said company do hereby covenant and agree to and with the said assured, well and truly to pay, or cause to be paid, the sum insured to the said assured, for her sole use, in conformity to the statute in such case made and provided, within ninety days after due notice and satisfactory evidence of the death of said William B. Drake during the continuance of this policy, and proof of the just claim of the assured under the same, any indebtedness to the company being first deducted therefrom. And in case of the death of said Catherine G. Drake before the decease of said William B. Drake, the amount of said insurance shall be payable to her children for their use, or to their guardian, if under age, within ninety days after due notice and satisfactory evidence of the death of said William B. Drake.

On the same day on which the Continental Life Insurance Company filed its answer to the original bill, the chancellor (Hon. A. W. Dillard,) made an order on its motion, that it be "allowed to file a cross bill in the nature of a bill of interpleader as of that date" (Dec. 4, 1874), and the bill was thereon filed.

The cross bill, after setting out the original bill filed in the cause, states substantially the same facts with reference to the issue of the policy and the death of the assured and his wife, and the claims of their children and grand children, &c., as disclosed in the original bill and the answer thereto. It admits the liability of the company upon the policy for the full amount, less certain credits for deferred premiums and loans, which are stated, and avers that it holds the money as a mere stake-holder, and is willing to pay to those entitled thereto whenever it can safely do so, and offers to bring the money into court and pay it over to the register or receiver whenever ordered to do so, but it is ignorant as to who is

rightfully entitled thereto, and has doubts as to whom the fund belongs. It then sets out the proceedings against it in the suit of Stone, Edwards and Pringle, in the chancery court at Mobile, and the dismissal of the bill in that case, and its pendency on appeal in the supreme court, as before stated in its answer to the original bill. The cross bill further states that the company has been served with a garnishment in a suit in the circuit court of Hale county, between Wm. H. Drake and a creditor of said Drake, which suit is still pending, and that the company has also been notified by said Mirian that she claims the interest of said William H. in said insurance fund, which is sought to be subjected in said garnishment suit, and, by reason of this litigation growing out of these claims and suits, is being injured and harrassed. The cross bill makes defendants all the parties to the original bill in this cause, and also Stone, Edwards and Pringle, who were complainants in the chancery suit at Mobile, and prays that it be heard and considered with the original bill; that the defendants severally be required to come in and interplead as to their respective claims and rights, and that the court adjudge and determine the same; that an account be taken of the amount due on the policy; that Stone, Edwards and Pringle, and all other persons be enjoined from prosecuting any suits at law or in equity to recover any part of the money due upon said policy, until the further order of the court, and for general relief.

Upon bond being given as prescribed by the chancellor (Hon. A. W. Dillard), an injunction issued as prayed in the cross bill, and on the 16th day of December, 1874, the chancellor made an interlocutory decree appointing a receiver to hold the fund which life insurance company desired to pay into court, and that upon such payment the Continental Life Insurance Company, complainant in the cross bill, be discharged from the necessity of all further litigation with respect to the fund; and the amount due upon the policy was afterwards deposited as authorized by this order.

Some of the defendants put in answers to the cross bill, decrees *pro confesso* were taken as to others, and Stone, Edwards and Pringle demurred, assigning numerous grounds, among others, that the cross bill showed they were not parties to the original bill; that the matters set up did not make a case authorizing a cross bill; that it appeared from the cross bill that the parties demurring claimed no title to the funds, but only the right to subject them; and that complainant could protect itself by pleading in a suit at law against it, or by pleading in the chancery suit at Mobile.

The cause was submitted for hearing on demurrer to the

cross bill and bill of interpleader, and the chancellor sustained the demurrer and dismissed the bill. The chancellor's decree further states that, "upon the announcement of the decision upon demurrer, complainant in the cross bill moved the court for leave to amend the same to meet the objections raised by the demurrer, and the court being of opinion that said cross bill was not amendable, so as to sustain it as a cross proceeding to the original suit, it was therefore ordered that said motion be not allowed."

The decree dismissing the bill, and the refusal to allow leave to amend, are now assigned for error.

W. P. WEBB, for appellant.

JAMES E. WEBB, COLEMAN & SEAY, THOS. R. ROULHAC, and GARRETT, contra.

BRICKELL, C. J.—1. "A cross bill ex vi terminorum, implies a bill by a defendant against the plaintiff in the same suit, or against other defendants in the same suit, or against both, touching the matters in question in the original bill." Story's Eq. Pl. § 389; 2 Dan. Ch. Pr. 1548. It is regarded as an auxiliary to, or as a dependency upon the original suit; and its subject matter is that of the original bill. New and distinct matter, not pertaining to that of the original bill, cannot be introduced by cross bill, and made the foundation of a decree.—2 Dan. Ch. Pr. 1548; *Nelson v. Dunn*, 15 Ala. 513. A dismissal of the original bill, resting in the election of the complainant, at any time before decree, carries with it the cross bill.—*Ladner et al. v. Ogden*, 31 Miss. 339. Founded on matters growing out of the original bill, if that is wanting in equity, and must of consequence fail, a cross bill, seeking as this bill does, the introduction of new parties, asserting rights conflicting with the rights asserted in the original bill, cannot be supported. If the new parties had been parties to the original bill, a demurrer or motion to dismiss for want of equity, could have been interposed by them, resulting in the dismissal of the original bill, which would have carried the cross bill with it. Of the right to make the defense, they cannot be deprived by introducing them as parties to the cross bill only. Nor in any case can a cross bill be maintained if the original bill is without equity. "It would seem" (says LIGON, J.,) "to be a solecism in terms, to speak of a.cross bill, when there is no original bill, and a paper, in the form of a bill in chancery, which contains no matter which would give that court jurisdiction, is not to be regarded as an original bill for any purpose, but is in legal con-

templation a nullity; and any action taken upon it in the court in which it is exhibited, except to dismiss it would be without authority and void."—*Dill v. Shahan*, 25 Ala. 703. Without adopting to its full extent, this language, we concur in the conclusion attained in that case, that when the original bill is without equity, the cross bill must fail. It is not necessary as a mode of defense, or to obtain more complete relief, than can be afforded on the original bill, which must fail, because of its inherent insufficiency to authorize any relief.

2. The original bill is filed to ascertain who are the beneficiaries in a policy of life insurance, to determine the quantum of the interest of each beneficiary in the insurance money, and to compel the insurer to pay the money into court that it may be distributed to those entitled to receive it; the complainant in the original bill asserting that his intestate was one of the beneficiaries. The contract of insurance, as it is disclosed in the bill, is purely a legal contract, creating only legal rights and obligations. If the event has happened, and it is averred in the original bill to have happened, on which the insurance money has become due and payable, the remedy at law for its recovery is adequate.—*Matteau v. London Ins. Co.* 1 Atk. 545. The only embarrassment of such remedy averred in the bill, is that the policy of insurance is in the possession of other persons, claiming to be beneficiaries under it, who have refused to exhibit it to the complainant. It is not averred these persons controvert the right of the complainant to share in the insurance money, nor that they refuse to resort to legal remedies for its recovery. The contract or policy of insurance is averred to be under seal, and the covenant for the payment of the insurance money, made by the insurer, is shown to have been in the alternative—to the wife of the person whose life was assured, if she survived him—or in the event he survived her, to her *children jointly*. The legal interest of the children who are the covenantees or promissees, is joint, and in an action thereon, all, if living, must join according to the rules of the common law, which, so far as a contract of this character is concerned, in which the legal and equitable or beneficial interests reside in the same persons, is unchanged by statute. *Blanchard v. Dyer*, 2 Me. 111. On the death of one of several obligees or covenantees, or promissees, having a joint legal interest at common law, the survivors alone could sue, and the personal representative of the deceased could not be joined. If he had a beneficial interest surviving to his personal representative, a court of equity would compel the survivors to account for his share of the sum when recovered.

And would, doubtless, if there was collusion between the survivors, and the persons from whom the debt was due; or if there was, because of the bankruptcy or insolvency of the survivors, danger of a loss of the fund, have intervened for the protection of the rights of the deceased. This rule of the common law is not changed, except as to contracts for the payment of money. In these contracts, if there is an equitable or beneficial interest, separable and distinct from the legal title, surviving to the personal representative, he not only may, but must join with the survivors under the operation of § 2523 of the Revised Code. The covenant on which the right is founded being for the payment of money only, if the complainant's intestate is one of the covenantees; one of the class *children*, to whom it is payable, she had an interest distinct and separable from that of the other covenantees, on whom the legal title devolved, surviving to complainant, as her personal representative, and an action at law for the recovery of the money, to which he was not a party could not be supported. Her interest and rights could not be impaired by any act of the surviving covenantees— they could not release it—a payment of the entire sum to them would not satisfy it—it is separable and distinct from that of the survivors, and the legal title to which they succeed. Nor can the survivors embarrass the personal representatives in the pursuit of the legal remedies for the recovery of the money. If they refuse to join in an action for its recovery, he may lawfully use their names, without their consent, they having a right to indemnity from him against costs.—1 Chit. Pl. 9 (note y); 3 Chit. Pr. 127-30. Nor could they dismiss such suit, or be permitted to affect its prosecution injuriously to the complainant.—*Cunningham v. Carpenter*, 10 Ala. 109; *Roden v. Murphy*, 10 Ala. 804.

The difficulty in a suit at law, suggested by the bill, is not that the survivors deny the interest of the complainant, or that it is denied by the insurer—nor that the survivors refuse to join him in a suit for the recovery of the money. The only embarrassment is, that the survivors have not shown him, and one, a husband of one of the beneficiaries, once refused to exhibit to him the policy of insurance, and not having access to it, he cannot state with accuracy its terms and conditions, wherefore he seeks a discovery of it. It is not averred that there is any dispute or controversy as to the terms or conditions of the policy, nor that any application has been made to the insurer for information of its terms and conditions. In an action at law on the policy, its production would be necessary, or an account given for its absence before secondary evidence of its contents would be

VOL. LIV.

admissible. The survivors in whose possession the policy is, would be competent witnesses, and through the aid of a *subpœna duces tecum,* could be compelled to produce the policy. Or without its aid, it would be in the power of the court to compel its production. The bill does not, therefore, disclose a case in which a discovery is material to support a suit at law; nor is it shown that the discovery sought is in aid of a suit brought, or intended to be brought, nor that the facts of which a discovery is sought, cannot be proved without the answer of the defendants. Indeed, it is manifest on the face of the bill that they are capable of such proof.

The bill is framed not only for discovery, but for relief. In a bill for discovery only, it may not be necessary to disclose that the facts sought to be discovered, are incapable of proof otherwise. A discovery may be had of mere cumulative evidence.—Story's Eq. Pl. § 324. But if the bill is framed for discovery and relief, and seeks to withdraw from the jurisdiction of courts of law matters of pure legal cognizance, it must be shown the discovery is indispensable to the ends of justice, and because of the inability of a court of law to compel it, the jurisdiction of a court of equity arises, as it arises generally, because of the inadequacy of legal remedies. Were the rule otherwise, on the pretense of seeking a discovery, a court of equity would be constantly invading the jurisdiction of courts of law.—Story's Eq. Pl. § 324; *Horton v. Mosely,* 17 Ala. 794; *Perrine v. Carlisle,* 19 Ala. 686; *Crothers v. Lee,* 29 Ala. 337. There is not the least embarrassment in the remedy of the complainant at law, if he has the right averred in his bill, and there is no ground on which a court of equity can intervene. It is apparent that a doubt exists in the minds of the parties whether the complainant's intestate is of the class of beneficiaries entitled to the insurance money. Such doubt, it is the peculiar province of a court of law to solve. Difficulty or doubt in the construction of contracts creating legal rights, is not a ground of equity jurisdiction; nor is that court more capable of solving and removing them than a court of law.

3. The insurer does not deny, but admits liability for the insurance money—protection in its payment, is all that is claimed. It becomes necessary, therefore, that future litigation may be avoided, to consider whether the complainant in the original bill has any interest in the insurance money. A copy of the policy of insurance is exhibited with the cross bill, and corresponds with the averments of its terms and conditions made in the original bill. Though on its face it is dated, and purports to have been issued in the City of

New York, it contains this stipulation: "This policy to take effect only when countersigned by Thomas Thompson & Co., agents at Mobile, Alabama." It could not be a perfect instrument—the evidence of a complete contract, fixing the rights and liabilities of the parties, until this act was done. Until it was countersigned it was inchoate. The final irrevocable assent of the parties, was and could be given only, on the countersigning and delivery of the policy. That being given here, the law of this State and not the law of New York, must control as to the validity and construction of the policy.—*Pomeroy v. Manhattan Ins. Co.*, 12 Cush. 416; *Heebner v. Eagle Ins. Co.*, 10 Gray, 131; Bliss on Life Ins. § 371.

The policy expresses in its face that it is made in consideration of the sum of one hundred and twenty-six eighty-nine one-hundredth dollars *in hand paid by Catherine G. Drake*, and of premiums to be paid subsequently at times specified; and that it is an assurance of the life of William B. Drake, "*for* the sole use of *his wife, Catherine G. Drake, and children*, in the amount of ten thousand dollars, for the term of his natural life." "And the said company do hereby covenant and agree to and with the said assured, well and truly to pay, or cause to be paid, the said sum insured to the said assured, for her sole use, in conformity with the statute in such case made and provided, within ninety days after due notice and satisfactory evidence of the death of said William B. Drake, during the continuance of the policy, and proof of the just claims of the assured under the same, any indebtedness to the company being first deducted therefrom. And in case of the death of the said Catherine G. Drake before the decease of the said William B. Drake, the amount of said insurance shall be payable to her children, for their use, or to their guardians, if under age, within ninety days after due notice and satisfactory evidence of the death of the said William B. Drake, as aforesaid."

The locality of the contract being regarded as here, it is the statute of this State, to which it refers, and in conformity to which it is declared to be made. This statute authorizes a married woman, in her own name or in the name of a trustee, to insure, for her sole use, the life of her husband, the amount of the insurance to be paid her, if she survive her husband, free from the claims of his representatives or creditors. If the premiums are paid by the husband, from his own funds, and exceed five hundred dollars annually, the exemption from the claims of creditors applies only in the proportion of five hundred dollars to the amount of premiums paid for such insurance. If the wife die before the decease of the husband, the amount of the insurance may be made payable after death to her children, for their use,

and to their guardians if under age."—R. C. p. 672, § 353 H.
I. The policy conforms substantially to this statute. The
purpose of the statute was to enable the wife to effect an
insurance on the life of her husband, for her own benefit, if
she survived him, or enuring to her children if he survived
her; exempt from the claims of creditors, though the pre-
miums were paid by the husband, to the extent that five
hundred dollars of annual premium purchased ; or, if the
whole premium was paid by her, from her own means, or by
another from his own means for her, then exempt from the
claims of her husband, or his creditors, or his personal rep-
resentatives, as it would have been without the statute. If
she died before the husband, the contract of insurance was
not to become inoperative, nor was it to survive to her per-
sonal representatives. Her children were to succeed to her
rights and place—to become the covenantees or promissees
of the policy. A provision for the family, deprived by the
death of the husband, of its natural and legal protector, on
whom the law devolved the duty of maintenance, was the
object to be accomplished. This object is deemed so merit-
orious, that the husband is permitted to withdraw from the
claims of his creditors, and appropriate to its accomplish-
ment, funds on which, in the absence of the statute, they
would have had the prior legal and equitable claim. In its
intent and purposes the statute must be regarded as enabling,
not as declaratory of existing law. By the terms of the
statute, and by the terms of the policy, the wife's right is
dependent on her surviving the husband. Her death in his
life is a termination of her right and interest, as it would be
the termination of her estate in lands granted or devised to
her for the term of her life only. The rights and interest of
the children, before contingent, depending for their existence
on the death of the mother before that of the husband, spring
up and become at least as fixed and certain as were the
rights of the mother.—*Conn. Mutual Life Ins. Co. v. Burroughs,*
34 Conn. 63, (5 c. 1 Bigelows's Life Ins. Rep. 63.)

In the construction of devises, and of conveyances, the
legal and popular signification of the word *children,* accord.
It designates immediate offspring only; and from that signi-
fication is not deflected unless otherwise the gift would fail,
or there is a manifest intention that it should have a larger
meaning.—2 Jarm. Wills, 51; *McGuire v. Westmoreland,* 36
Ala. 594. This is a practical application of a general rule of
construction, of as much force in construing statutes, or con-
tracts not operating a transfer of property, as in the con-
struction of devises or conveyances—that general words are
to be taken in their ordinary signification, and technical

words in their technical sense, unless a clear intention to use them in another. sense be collected, and that other clearly ascertained.

No other than its ordinary popular signification, as comprehending immediate descendants only, can be given the word *children*, as it is found in this statute and policy—it does not embrace grand-children, or lineal descendants, remote in degree. This construction conforms to the purpose the statute intended, to enable the wife to accomplish by the contract of insurance—a provision for the family, the husband was under the legal duty of maintaining. The duty of maintenance of the grand-child, was not imposed on the husband, and to extend the meaning of the word *children*, so as to embrace grand-children, would give the words of the statute and policy, a meaning larger than the purposes to be accomplished warrant.

Though the term *children* may not include other than immediate lineal descendants—the precise question on which the right of the complainant depends, is whether the term *children*, as employed in the policy, and in the statute, (for it must have the same signification in each, the policy expressing it is made in conformity to the statute,) includes *children* in existence at the time of the issue of the policy, or only *children* in existence at the death of the mother, or at the time of the death of the assured. We say in the alternative, the time of the death of the mother, or of the death of the assured, because in this case it is not material whether the one or the other is taken as the period at which those who are entitled to take under the term *children*, is to be ascertained; for whether the one period or the other is the time for ascertaining, the same persons would take. The precise question, therefore, is whether *a child in being* when the policy issued, but dying before the mother and before the decease of the father, is embraced in the term *children*—whether *such child* is one of the beneficiaries, succeeding to the rights of the mother—to whom the promise and covenant, before due and payable only to the mother, shifts, and becomes a promise and covenant to *such child*.

The policy contains, in effect, two distinct covenants for the payment of the insurance money—the first is for payment to the wife—the second is for payment to the children, in the event the wife does not survive the assured. It is not a joint covenant to *the wife and children*. There is no event contemplated, in which *the wife and children* will take the insurance money jointly or in common. They take distinct, separate and independent, the one from the other. The *children* can never take under the policy, or the statute, if *the wife is in*

*being,* capable of taking, and the event occurs, on which the insurance money becomes payable. It is only in the event of her death, at that time, that there is a covenant or promise of payment to them. True, there is the recital in the policy that the assurance is for the life of William B. Drake, "for the use of his wife, Catherine G. Drake, and children," preceding the covenants for the payment of the insurance money. If these general words stood alone, undefined, unexplained and uncontrolled by succeeding words, the wife and the children living when the policy issued, would be joint beneficiaries. The death of the wife, nor the death of any child, would defeat or divest the right and interest the policy creates. These general words, mere recital, are explained and defined by the express covenants for the payment of the insurance money, immediately succeeding them. These covenants show the use of the wife and the use of the children, and it is to this use, clearly and distinctly expressed, the general words refer. The covenant is first for payment to the wife *for her sole use.* These are the words of the statute, in conformity to which the policy purports to be made; and are the words which have long been employed in this State to create; and which judicial decision, long prior to the statute, had declared sufficient to create in the wife a separate estate, freed from all marital right of the husband—an estate held and enjoyed by her as if she were a *feme sole.* The words can not have less significance in this policy. To the extent of the wife's interest, they exclude all other than a sole, independent right and interest. The interest is contingent as to the right to recover and receive the insurance money—that right can only arise on the death of the husband and the continuous performance of the conditions of the policy. It is, however, a vested interest in the wife, subject to be divested by her death, before that of the husband. If her interest is divested—if by the terms of its limitation it expires, then that the policy, in its very nature a contract continuing until the death of the husband, shall not become inoperative, the covenant is for the payment of the insurance money to the children of the wife, on the happening of the same event, on which it was payable to the wife. The covenant for the payment to the wife, and the covenant for the payment to the children, are distinct, the latter intended as the alternate, or substitute of the former. This is in conformity to the statute, which declares not that the amount of the insurance, shall be payable to the wife and children jointly, but to the wife for her sole *use;* and *in case of her death,* before the decease of the husband, may be made payable *to the children for their use.*

The right of the *children*, is conditional, and contingent, dependent on an event which may never occur. A legacy, the payment of which is dependent on an uncertain event of this character, lapses if the legatee dies before the happening of the event.—2 Will. Ex'rs, 1055 ; 2 Lom. Ex. 113; *Marr v. McCullough*, 6 Port. 509 ; *Nixon v. Robbins*, 24 Ala. 663 ; *Travis v. Morrison*, 28 Ala. 494. The condition or contingency on which the right depends, not having occurred while the legatee was *in esse*, capable of taking, the legacy fails for the want of a donee. So when a legacy is given to a class of persons, that class is to be ascertained at the time of the distribution, and those only can take who are of the class at that time.—*Leigh v. Leigh*, 17 Beav. 605 ; *Viner v. Francis*, 1 Cox, Ch. 150 ; 2 Wms. Ex'rs, 1093. The policy is not a testamentary disposition ; nor is the principle or the reasoning on which those rules proceed, peculiar to legacies or devises. There are nice and refined distinctions observed in their application to testamentary dispositions, deemed necessary to effectuate the intent of the testator, deduced often, not only from his words, but the state of his affections, his duties and relations. The intent of the parties to the policy, and of the law maker in the enactment of the statute, under which it issued, deduced from the words employed, and the purposes proposed to be accomplished, lead us to the conclusion that the *children* to whom the covenant extends, are only *children living* at the decease of the mother and father. We say at the decease of both, because it is not necessary now to consider whether *children dying* after the mother, and before the father, would take under the covenant or not. The statute is indefensible, so far as it permits the husband, for the use of his *wife and children*, to insure his life, paying the premiums with moneys which ought to be appropriated to the payment of his debts, on any other theory than that thereby he is only performing a natural and legal duty, which laws of exemption, and other laws, have recognized as of equivalent obligation to that of his contracts. To this extent only is the statute enabling, or declaratory of any rule, not before existing in law. Without the statute he could have insured his life, or the wife could have insured it, for her own benefit, or the benefit of herself and children. In the absence of the statute creditors could pursue and condemn the insurance money when it became due and payable, to the satisfaction of their demands, without regard to the form or terms of the policy, if it had been purchased with premims paid by the husband. On the father rests not only the obligation of his contracts, but the moral, natural, legal duty of maintaining wife and child. The duty to the wife terminates only with

her death, or a dissolution of the marital relation. The duty to the child, in morals and nature, is terminated only by death; though, as a legal duty, it terminates at the age prescribed for emancipation from parental authority. It is "nature's profession," says Lord COKE, "to assist, maintain, and console the child." Chancellor KENT says, "the laws and customs of all nations have enforced the plain precept of universal law—that the parent must maintain the child in its necessity and weakness." "A father's house is always open to his children. The best feelings of our nature establish and consecrate this asylum. Under the thousand pains and perils of human life, the home of the parents is to the children a sure refuge from evil, and a consolation in distress. In the intenseness, the lively touches, and unsubdued nature of parental affection, we discern the wisdom and goodness of the great author of our being, and Father of Mercies."—2 Kent, 189. In the wisdom and humanity of legislation, to cure a deficiency in the common law, which inexorably demanded the performance of contracts, as of paramount duty, to that of maintaining wife and child, during life of husband and father; and would not tolerate, but would have denounced as fraudulent the accumulation of a fund for their maintenance, in preference to the payment of debts, when death consigned the one to widowhood and the other to orphanage, the statute has its origin. The construction it must receive, must limit it, so far- as its words permit, to the accomplishment of providing maintenance only for those to whom it was due from the father living. Extended beyond this, it would be offensive to good conscience, and would be a mere statutory authority for perpetrating a fraud on creditors. Death of the child terminates the parental duty of maintenance. That duty does not legally extend to the offspring of the child, though nature and affection may enjoin it for them, and secure its performance as certainly as if commanded by positive municipal law. The children to whom the covenant in the policy extends, are *children living at the death of mother and father—to whom the duty of maintenance extends if they are in minority.* These alone are within the words and spirit of the statute. Any other construction would convert the statute in its practical operation into an agency, by which the husband and father, in defiance of the just rights of his creditors, and not in obedience to legal duty, could accumulate a fund, for dispensation and distribution in the exercise of mere generosity. The participants in this fund, would often in the course of descents and distribution, as in this case, if complainant's claim were allowed, be strangers to his blood and affection, to whom he owed no duty.

The complainant in the original bill is without right or interest in the insurance money, and of consequence the bill is devoid of equity. There was, therefore, no error in sustaining the demurrer to appellant's cross bill. The amendment of the cross bill was not properly applied for—the proposed amendment was not presented to the chancellor— merely a general leave to amend requested. Such leave can not be obtained in chancery. The amendment desired must be presented to the chancellor, that he may determine whether it is allowable. The refusal of mere leave to amend and not of a particular amendment presented to the court, is not error. No amendment of the cross bill could have imparted equity to the original bill, and for this reason, if an amendment had been properly presented, it should not have been allowed.

The decree is affirmed.